# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

DANIEL B. DENGEL,

                    Plaintiff,

v.

WAUKESHA COUNTY,

                    Defendant.

Case No. 13-CV-484-JPS

ORDER

The plaintiff, Daniel Dengel, filed this suit on April 30, 2013. (Docket #1). In it, he alleges that his former employer, Waukesha County ("Waukesha" or "the County"), terminated his employment in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* (Compl. ¶¶ 1, 32–37). The County moved for summary judgment on Dengel's claims. (Docket #24). That motion is now fully briefed (Docket #25, #34, #44), and the Court addresses it.

## 1.     FACTUAL BACKGROUND[1]

There are two essential pieces of this story: first, background about Mr. Dengel's behavior; and, second, the County's steps to address Mr. Dengel's behavior. The Court will discuss each of those component parts separately, as follows.

### 1.1    Daniel Dengel's Behavior

Daniel Dengel worked for Waukesha County's Department of Emergency preparedness from May 24, 1999, until November 19, 2010. (DPFF ¶ 4). During that time, he served as a Radio Services Technician. (DPFF ¶ 4).

---

[1]The Court will refer to the Plaintiff's Proposed Findings of Fact, found at Docket Entry No. 33, as "PPFF." Likewise, the Court will refer to the Defendant's Proposed Findings of Fact, located at Docket Entry No. 30, as "DPFF."

That position required him to install, maintain, and repair the County's various radio communication systems. (DPFF ¶ 5). Some of the primary users of those communications systems were emergency services providers: the police, fire, and EMS departments, all of which used the systems for communication, dispatching, and warning siren systems. (DPFF ¶ 5).

Mr. Dengel generally received good performance reviews while working in his position. (DPFF ¶ 12). He was rated as "Greater Than Effective" during every period he worked until the 2008–2009 period. (DPFF ¶ 12). His performance rating dropped, however, for the 2008–2009 period, as a result of reported timeliness and task completion issues. (DPFF ¶¶ 12–13 (quoting from Tuma Aff., Ex. 3 (2008–2009 Performance Evaluation)). Nonetheless, for the 2008–2009 period, Mr. Dengel was still rated "Effective." (DPFF ¶ 12).

Beginning around August of 2009, Mr. Dengel engaged in a series of behaviors that his supervisors found strange. First, on August 24, 2009, Mr. Dengel sent an email to the County's other Radio Services staff, stating "To Whom It May Concern: Please return the medium point black Sharpie to the pen holder next to my pc…the one labeled 'Put it back or I'll break your fingers!'" (DPFF ¶ 15 (admitted); *but see* PPFF ¶ 22 (asserting that supervisors never addressed this issue with Mr. Dengel)).

Second, in September of 2009, Mr. Dengel became concerned with the safety of a van in the County's fleet of vehicles. (DPFF ¶ 16 (denied, but there can be no dispute that Mr. Dengel was concerned with the van's safety, as he had numerous contacts in this regard, *see* DPFF ¶ 18, PPFF ¶ 24)). There is some dispute over whether Mr. Dengel was the only employee to have had these concerns. (*Compare* DPFF ¶ 16 *with* PPFF ¶ 23). Regardless, Mr.

Dengel's concern about the van escalated. (*See* DPFF ¶¶ 17–18; PPFF ¶ 24). Even after a dealership inspected the van and found nothing wrong with it, Mr. Dengel contacted a second dealership, whom he asserts told him the van was unsafe. (*See* DPFF ¶ 17, PPFF ¶ 24). (One of Mr. Dengel's supervisors, Richard Tuma, also allegedly took the van for a drive and discovered nothing wrong with it. (DPFF ¶ 19 (denied))).[2] Mr. Dengel then sent an email to the County's Fleet Maintenance and Purchasing Division—without authorization from his supervisors and despite the first dealership's having found nothing wrong with the van—urging the employees in that division to drive the van on a longer trip, to experience the issues with it. (DPFF ¶ 18).

The third incident occurred over a period from late May through June of 2010. On May 24, 2010, Mr. Dengel told a supervisor that some person had "inhibited" a radio and then "uninhibited" it; in response, the supervisor ordered an investigation. (DPFF ¶ 22). Then, at Mr. Dengel's request, a Human Resources ("HR") agent met with Mr. Dengel to discuss the radio issue. (DPFF ¶ 23). Mr. Dengel apparently believed that a supervisor had,

---

[2]The Court points out, here, that Mr. Dengel's counsel has—at many points in the response to the Defendant's Proposed Findings of Fact—denied a statement of fact without good basis. For example, in this instance at DPFF ¶ 19, Mr. Dengel's counsel has written "DENY, see PPFOF ¶¶ 22, 23." (Pl.'s Resp. to DPFF (Docket #31) ¶ 19). That comes in response to the County's proposed fact that "Mr. Tuma drove the van and found no drivability issues. No other personnel complained about the van." But, turning to proposed facts cited in rebuttal, the Court finds only that Mr. Dengel asserts that: (1) supervisors did not address certain incidents with Mr. Dengel (PPFF ¶ 22); and (2) that an email exists regarding other employees who complained about the van (PPFF ¶ 23). That latter proposed fact certainly rebuts the latter half of DPFF ¶ 19. But Mr. Dengel's counsel has not cited anything to rebut the first half of DPFF ¶ 19. And this is consistent throughout much of Mr. Dengel's responses: counsel has cited to proposed facts that may *diminish the importance of* the County's proposed facts, but has not cited to anything that would actually serve to *rebut* the County's proposed facts. In that regard, many of Mr. Dengel's denials are without merit.

himself, "inhibited" the radio. (DPFF ¶ 23). Mr. Dengel wanted a further investigation performed on this matter. (DPFF ¶ 23). At the HR agent's urging, Mr. Dengel met with various supervisors in the Radio Services department, who listened to Mr. Dengel's concerns and agreed to investigate the matter further. (DPFF ¶ 24). Mr. Dengel's supervisor *did* investigate further, and ultimately determined that Mr. Dengel's concerns were unfounded. (DPFF ¶ 28). On July 13, 2010, the supervisor wrote a summary and letter to Mr. Dengel, stating that the system log did not show that the radio in question had been inhibited. (DPFF ¶ 28 (quoting Tuma Aff., Ex. 4 (7/13/10 Summary and Letter))). He noted that any temporary problem may have been caused by a loose power connection, but that ultimately the "inhibited" status did not effect the security or reliability of the system. (DPFF ¶ 28).

Mr. Dengel, however, was not ready to accept the outcome of that investigation. (*See* DPFF ¶¶ 29–31). First, he demanded that his supervisor contact the radio's manufacturer to get more information; this did not lead to any information that would have confirmed Mr. Dengel's concerns. (DPFF ¶ 29). Next, Mr. Dengel contacted the City of Waukesha's police chief to tell him about the issue. (DPFF ¶ 30). Nothing in the record shows that Mr. Dengel received authorization to make this disclosure or notified his superiors that he planned to do so. Predictably, the police chief demanded an investigation into the issue. (DPFF ¶ 30). Mr. Dengel also contacted the Waukesha County Executive's office about the radio issue, again seemingly without authorization, prompting a separate demand for an additional investigation. (DPFF ¶ 31). Mr. Dengel's supervisor performed additional

investigation as necessary, again yielding nothing to support Mr. Dengel's concerns.

The fourth major incident occurred on August 5, 2010. (DPFF ¶¶ 33–34). On that day, a cleaning person could not replace paper towels in a paper towel dispenser, because she could not find the dispenser's key. (DPFF ¶ 34). Eventually, she found the key hidden behind the bathroom's mirror. (DPFF ¶ 34). The key was given to another of Mr. Dengel's supervisors for safekeeping. (DPFF ¶ 34). Mr. Dengel then demanded that this supervisor return the key to him. (DPFF ¶ 34). Mr. Dengel stated that the key was his personal property, and was not the key belonging to the County. (DPFF ¶ 34). He refused to explain how he would have gotten a copy of a key intended to operate a County-owned paper towel dispenser, and later asserted that he had received the key from "Joe," but provided no last name. (DPFF ¶ 34). Mr. Dengel then aggressively informed his supervisor that the supervisor had "no right" to keep the key and "can't control" him. (DPFF ¶ 34).

This supervisor informed the Radio Services director about this interaction by email. (DPFF ¶ 35). He particularly noted that he was concerned about the incident, because it was another instance of Mr. Dengel accusing him of something. (DPFF ¶ 34 (the first time presumably relating to the radio incident)). The Radio Services director forwarded the email to HR, stating that he was concerned about Mr. Dengel's erratic behavior, and was concerned with Mr. Dengel's stability and its effect on the integrity of the County's radio system and the other employees. (DPFF ¶ 35).

Aside from the four more-major incidents described above, Mr. Dengel also allegedly took other actions deemed to be concerning. Many of

these are more minor than the above-noted incidents and the parties also argue over both whether they occurred and whether they are important. And, generally, they are non-material. They play little role in the parties' legal arguments, and they play no role in the Court's final analysis. Nonetheless, the Court notes them (along with disputes about them) simply to provide additional background, and to make clear that they are non-material.

November 2009 and February 2010 saw two very minor incidents that are the subject of a dispute between the parties. (*See* DPFF ¶¶ 20–21 (denied); PPFF ¶¶ 25–26). In the first instance, Mr. Dengel allegedly arrived late for an appointment without explanation (Mr. Dengel asserts he received permission to be late). (DPFF ¶ 20; PPFF ¶ 25). In the latter, Mr. Dengel allegedly failed to adequately log and bill time on the installation of a radio, and did not respond to inquiries about the radio (Mr. Dengel alleges he inquired about how he should log and bill his time in this regard and never received a response). (DPFF ¶ 21; PPFF ¶ 26).

On June 22, 2010, Mr. Dengel allegedly turned an important air conditioning unit off, though he denies this. (DPFF ¶ 25 (denied); PPFF ¶ 27). The air conditioning unit is intended to keep important communications equipment at a safe temperature, but was switched off. (DPFF ¶ 25). Mr. Dengel's supervisor emailed the Radio Services employees to determine who had switched it off. Mr. Dengel did not respond. (DPFF ¶ 25). He was also the last individual in the room. (DPFF ¶ 25).

On two separate occasions, employees reported to supervisors that Mr. Dengel had "peeled out" of the parking lot, screeching his tires. (DPFF ¶¶ 26–27). It is unclear when this was reported, but it may not have occurred

until after the County's allegedly-illegal actions already took place, so it is ultimately immaterial.

Another disputed incident occurred in June 2010, when Mr. Dengel allegedly broke a co-worker's keyboard and mouse. (DPFF ¶ 32; PPFF ¶ 15). Mr. Dengel denies that this occurred. (PPFF ¶ 15). The Court will not treat it as true.

Finally, in a much-discussed (though only marginally relevant) incident, on August 5, 2010, Mr. Dengel allegedly placed a bug in a clear plastic bag and took it around to his co-workers requesting that they identify the bug. (DPFF ¶ 36). He placed it on his supervisor's desk and asked for it to be identified. (DPFF ¶ 36). Mr. Dengel does not dispute that this occurred, but alleges that his supervisor had also brought in bugs in the past and displayed them to co-workers. (PPFF ¶ 14). In the end, this is a minor incident that does not seem to have formed a major part of the County's decision-making process regarding how to address Mr. Dengel's behavior, as the Court will now discuss.

### 1.2   County's Response

On the same day that the bug incident occurred, Mr. Dengel's supervisors and the HR department exchanged emails about him. First, his supervisor sent an email to the director of the Emergency Preparedness team regarding the paper towel key incident. (DPFF ¶ 34). The director then forwarded that email to HR, along with the following message:

> Renee, you can see from the email that there is something wrong with Dan's behavior. This is in no way normal behavior. I am looking to you for some recommendations as I am worried about his stability, the integrity of the radio system, and the safety of the employees at that location.

That email prompted the HR department to speak with the County's Employee Assistance Program (EAP) to get some advice on whether EAP could provide assistance in the situation. (DPFF ¶ 37).

The County has offered the EAP program to all of its employees for many years, and the program is intended to assist employees and their family members with personal and family problems. (DPFF ¶¶ 37–39). Employees can self report to the program or the employer may refer employees to the program; in the latter situation, mandatory referrals are typically made when an employee's work is suffering. (DPFF ¶ 41). When there is a mandatory referral, the employee is occasionally placed on leave when there are workplace safety or performance concerns. (DPFF ¶¶ 41, 42). If the employee is placed on leave, he or she must draw upon accrued sick leave or other paid time off, if he or she wishes to receive pay during the absence. (DPFF ¶ 41).

The HR representative met with Mr. Dengel and his supervisors on August 12, 2010. (DPFF ¶ 45). They discussed the issues with Mr. Dengel's behavior and work performance, specifically: (1) the inhibited radio issue; (2) the paper towel key issue; (3) the broken keyboard issue; (4) the bug issue; and (5) reports from co-workers that Mr. Dengel was suffering from mood swings. (DPFF ¶ 45). One of Mr. Dengel's supervisors explained that they were concerned with Mr. Dengel's focus on non-work-related issues. (DPFF ¶ 47 (denied in part, but denial does not relate specifically to this conclusion)).

At the same meeting, the HR representative informed Mr. Dengel that they were referring him to EAP. (DPFF ¶ 46 (denied in part, but denial does not relate specifically to this conclusion)). Mr. Dengel was told to call EAP to

set up an appointment within 24 hours and asked him to sign a waiver that would allow EAP to disclose limited information about the sessions to the County; they informed him that the waiver would not allow EAP to discuss any specific topics of conversation of any EAP session with the County. (DPFF ¶¶ 46–47 (denied, but denial of these conclusions is unsubstantiated)).

Mr. Dengel attended the first scheduled EAP session. (DPFF ¶ 51). At that session, the EAP provider informed Mr. Dengel that the details about the meeting would not be shared with the County and that EAP decisions would be made by EAP counselors, rather than the County. (DPFF ¶ 51; PPFF ¶ 30). The EAP provider also requested that Mr. Dengel sign a waiver that would allow disclosure to the County; when Mr. Dengel objected, the EAP provider informed him that the waiver would not allow disclosure of the contents of any discussion and that it may be possible to remove certain portions of the waiver that made Mr. Dengel uncomfortable. (PPFF ¶ 30). At the end of the first session, the EAP provider informed the County that Mr. Dengel had attended the session, but did not disclose any other information. (DPFF ¶ 51).

EAP scheduled another appointment with Mr. Dengel for August 17, 2010. (DPFF ¶ 52). Mr. Dengel never arrived. (DPFF ¶ 52). Instead, he called EAP to inform them that he was going to first stop at the Waukesha County Sheriff's Department to have a statement witnessed. (DPFF ¶ 52). Rather than coming to EAP after doing so, Mr. Dengel instead reported straight to work. (DPFF ¶ 52).

This action prompted another meeting—this one very important. (DPFF ¶ 53). Because Mr. Dengel failed to show up for the scheduled EAP session, even after telling the EAP provider that he would do so after stopping at the Sheriff's Department, the EAP provider had to drive to the

Radio Services department, where he met with Mr. Dengel and Mr. Dengel's supervisors. (DPFF ¶ 53). At this meeting, the EAP provider determined that it was necessary to place Mr. Dengel on sick leave. (DPFF ¶ 53). EAP would not allow Mr. Dengel to return to work unless he followed through on EAP's treatment recommendations and received a release to work from either EAP or another appropriate medical provider. (DPFF ¶ 53).

After that meeting, the EAP provider spoke with a deputy sheriff who informed him that Mr. Dengel seemed to be "right on the edge." (DPFF ¶ 54). The EAP provider gave this concern additional credence because of the fact that the deputy sheriff had received specific training to assess individuals who may be a harm to themselves or others. (DPFF ¶ 54). Based upon those concerns, the EAP provider determined that it would be necessary to require Mr. Dengel to undergo a fitness for duty evaluation before he would be allowed to return to work. (DPFF ¶ 54).

The fitness for duty evaluation is different than both an EAP referral and a work release requirement. (*See* DPFF ¶ 55). An EAP referral requires only that the referred employee meet with EAP. A work release requirement seems to be a step up, requiring that the employee receive approval to return to work from EAP or some other qualified assessor. Meanwhile, the fitness for duty evaluation is a more formal evaluation and requires that the employee receive an assessment from a doctor before returning to work. (DPFF ¶ 55).

HR scheduled a fitness for duty examination for Mr. Dengel to take place on September 27, 2010. (DPFF ¶ 56). Through his lawyer at the time (different than Mr. Dengel's current counsel), Mr. Dengel informed the County that he would not participate in the fitness for duty examination.

(DPFF ¶ 58). On September 27, 2014, Mr. Dengel did not attend the scheduled examination. (DPFF ¶ 58). After that date, the County never again sought a fitness for duty examination. In fact, HR informed EAP that it would not require Mr. Dengel to receive a fitness for duty examination before allowing him to return to work. (DPFF ¶ 61).

Instead, it was determined that Mr. Dengel should be allowed to return to work with only a return to work release, which could be provided by Mr. Dengel's treating psychologist. (DPFF ¶¶ 61–62). It seems that authorization from EAP would have worked to satisfy this, as well, but Mr. Dengel's EAP provider stated that he had not received a waiver of confidentiality from Mr. Dengel that would allow him to provide such information to the County. (DPFF ¶ 63–64). Similarly, Mr. Dengel would not provide a waiver that would allow the County to receive a return to work authorization from his psychologist. (DPFF ¶ 65).

On October 7, 2010, Mr. Dengel received notification from the County that he needed to submit a return to work authorization from his psychologist and further that his paid leave days were diminishing. (DPFF ¶ 66). Mr. Dengel responded, stating that he had made an appointment with a counselor and would need to have EAP provide the counselor with information about his employment. (DPFF ¶ 67).

EAP, of course, could not provide that information without Mr. Dengel's approval. (DPFF ¶ 68). Thus, on October 26, 2010, HR informed Mr. Dengel that the County expected him to provide his approval of that disclosure by signing a waiver form. (DPFF ¶ 69). In that October 26, 2010, correspondence, the County made its expectations of Mr. Dengel very clear: he needed to contact EAP prior to October 28, 2010, and sign any relevant

documents, to ensure that EAP could collaborate with his counselor regarding ongoing treatment and disclosure of the return to work authorization. (DPFF ¶ 69). The County made the consequence of non-compliance very clear. (DPFF ¶ 69). It informed Mr. Dengel that "[y]ou must comply with all of the above expectations, if you fail to do so, your employment with Waukesha County may be terminated." (DPFF ¶ 69).

Despite those clear communications from the County, Mr. Dengel did not sign the required waivers. (*See* PPFF ¶¶ 57–59). Thus, despite the fact that Mr. Dengel was seeing a counselor (PPFF ¶ 57), that counselor never provided the necessary work release to the County (PPFF ¶¶ 58–59). Mr. Dengel alleges that he had good reason for this, specifically that he believed that his attorney was handling the coordination between EAP and his counselor. (PPFF ¶¶ 58–59). Mr. Dengel testified to that position during his deposition, although the County disputes the allegation. (*See* Def.'s Resp. to PPFF ¶¶ 58–59).

Rather than comply, Mr. Dengel, through counsel, responded by raising questions about the County's requirements. (DPFF ¶ 70). HR responded to Mr. Dengel's attorney, informing him that a fitness for duty examination was no longer required and that the work release could be provided by Mr. Dengel's counselor. (DPFF ¶ 72). HR also followed up with two separate letters, reiterating the fact that Mr. Dengel's leave was running out. (DPFF ¶¶ 71–72). In the later of those two letters, the County again provided Mr. Dengel, through his attorney, with a very clear assessment of the situation, and explicitly detailed the need for Mr. Dengel to sign the disclosure waivers, so as to allow EAP to obtain the work release from Mr.

Dengel's counselor (and further to allow EAP to disclose relevant information to the County). (DPFF ¶¶ 72).

Mr. Dengel, through his attorney, responded to the latter of those two letters on November 9, 2010. (PPFF ¶ 61). He stated that he believed the County was violating the ADA by requiring medical documentation and requested that the County provide reasons for its concern with Mr. Dengel's mental state. (PPFF ¶ 61).

In response, the County stated that it did not believe Mr. Dengel had a medical issue—merely a behavioral one. (DPFF ¶ 74). The County also provided more information about the difference between a fitness for duty examination, return to work release, and EAP referral. (DPFF ¶ 74). It clarified that it was no longer seeking a fitness for duty evaluation, but that it still needed a return to work release. (DPFF ¶ 74). The County again reiterated the fact that Mr. Dengel would need to submit waiver forms, so as to allow EAP and the County access to relevant information about his return to work release through his counselor. (DPFF ¶ 74).

Mr. Dengel's attorney agreed with the County's assessment. On November 16, 2010, he told Mr. Dengel that it would be in Mr. Dengel's best interest to comply with the County's requests. (DPFF ¶ 75). Mr. Dengel's attorney stated that "I continue to believe that the County may have justification for sending you to a psychological examination based on the behavior that was reported and the safety-sensitive position that you hold." (DPFF ¶ 75).

Mr. Dengel did not take his own attorney's advice. His leave expired on November 19, 2010, at which time he still had not signed the waiver forms. (DPFF ¶ 76–77). He emailed an employee regarding a return to work

question on that day, but never followed up, despite being told to call. (DPFF ¶ 77).

Thus, Mr. Dengel's leave having expired without him taking any action, HR sent him a letter on November 22, 2010, informing him that it viewed him to have voluntarily terminated his employment. (DPFF ¶ 78).

Mr. Dengel thereafter filed for unemployment compensation benefits, which the State of Wisconsin, Department of Workforce Development, denied, finding that Mr. Dengel "was not discharged but quit his employment when he failed to provide his employer with the required medical documentation to return to work…." (DPFF ¶ 81). That determination was reversed on Mr. Dengel's appeal; but the Labor Industry Review Commission ("LIRC") later reinstated the original denial of benefits. (DPFF ¶¶ 82–83). LIRC found that Mr. Dengel voluntarily terminated his employment by failing to provide the required documents.

Mr. Dengel filed a charge of discrimination against the County on December 7, 2010. (DPFF ¶ 80). He received a right to sue letter on February 11, 2013, and thereafter filed this suit alleging that the County had violated the ADA.

2.    DISCUSSION

Mr. Dengel posits that the County violated the ADA in three separate ways. First, he alleges that the County discriminated against him by illegally requiring him to undergo a medical evaluation that was neither job-related nor consistent with business necessity, in violation of 42 U.S.C. §§ 12112(d)(4)(A). (Pl.'s Resp. (Docket #34), 6–9). The Court will refer to that first claim as Mr. Dengel's "medical evaluation claim." Second, he argues that the County regarded him as disabled and imposed an adverse employment

action upon him because of that disability, in spite of the fact that he is qualified to perform the essential functions of the job, in violation of 42 U.S.C. § 12102. (Pl.'s Resp., 9–15). The Court will refer to this second claim as Mr. Dengel's "standard discrimination claim." Third, Mr. Dengel asserts that the County retaliated against him for engaging in protected activity, in violation of 42 U.S.C. § 12203(a). (Pl.'s Resp., 15–16). The Court will address that third claim as Mr. Dengel's "retaliation claim."

The County disagrees with all of those arguments, and has moved for summary judgment against Mr. Dengel. (Docket #24). That motion is fully briefed (Docket #24, #34, #44), and the Court now turns to address it.

### 2.1 Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### 2.2 Substantive Analysis of Mr. Dengel's Claims

As mentioned above, Mr. Dengel asserts three separate ADA-related claims. The Court will address each in turn.

#### 2.2.1 Medical Evaluation Claim

42 U.S.C. § 12112(d)(4)(A) states that employers "shall not require a medical examination and shall not make inquiries of an employee as to whether such an employee is an individual with a disability or as to the

nature or severity of the disability, unless such examination is shown to be job-related and consistent with business necessity." Mr. Dengel alleges that the County violated this provision by requiring him to cooperate with EAP and submit to either a fitness for duty or return to work evaluation.[3]

There is a significant preliminary question of whether this provision even applies to Mr. Dengel. The Seventh Circuit has never firmly decided that a non-disabled individual is entitled to bring a claim under 42 U.S.C. § 12112(d). *See Sanders v. Illinois Dept. of Cent. Mgmt. Servs.*, 530 F. App'x 593, 594 (7th Cir. 2013). There, the Seventh Circuit noted that the district court had "asked the parties to consider whether a non-disabled individual could bring a claim under § 12112(d)[, r]ecognizing that this circuit has not resolved the issue, the [district] court allowed the claim to go forward because other circuits have ruled that a plaintiff need not show a disability…." *Id.* (citing *O'Neal v. City of New Albany*, 293 F.3d 998, 1007 (7th Cir. 2002) for proposition that Seventh Circuit has never decided the issue. Also citing *Kroll v. White Lake Ambulance Auth.*, 691 F.3d 809, 814 (6th Cir. 2012); *Cossette v. Minn. Power & Light*, 188 F.3d 964, 969 (8th Cir. 1999); *Fredenburg v. Contra Costa Cty. Dep't of Health Servs.*, 172 F.3d 1176, 1181–82 (9th Cir. 1999); and *Griffin v. Steeltek, Inc.*, 160 F.3d 591, 593–95 (10th Cir. 1998) for proposition that other circuits have found that even those without a disability may sue under 42 U.S.C.

---

[3]Mr. Dengel may not actually assert that all three of these actions were improperly-required medical evaluations. For example, in his brief, he states that "[b]ecause, in the end, Mr. Dengel was not required to attend the Fitness for Duty Evaluation, this brief will not cover that." (Pl.'s Resp., 7). Mr. Dengel does not formally abandon that claim, though. Regardless, the County never "required" that he undergo that fitness for duty examination—and so, the County could not have violated 42 U.S.C. § 12112(d)(4)(A). Finding that potential portion of Mr. Dengel's claim to be without merit, the Court will not address the fitness for duty examination further.

§ 12112(d)). The Seventh Circuit did not explicitly resolve the question in deciding *Sanders*, but *did* affirm the district court's decision. 530 F. App'x at 595. The Court takes this as good evidence that the Seventh Circuit approved of the district court's application of 42 U.S.C. § 12112(d) to a non-disabled individual. That, coupled with the case law from other circuits, as cited by the *Sanders* court, convince the Court that it should apply 42 U.S.C. § 12112(d)(4)(A) to Mr. Dengel's situation, in spite of the fact that Mr. Dengel does not claim that he is actually disabled. *See also Murdock v. Washington*, 193 F.3d 510, 512 (7th Cir. 1999) (noting that "[a]lthough Title I of the ADA, prohibiting disability discrimination in employment, has a section limiting medical testing for disabilities, see 42 U.S.C. § 12112(d)(2)-(4), and does not require that an individual be disabled to state a claim," but ultimately not deciding the issue because the ADA did not apply to the plaintiff, a prisoner).

As such, one question remains: whether the examinations were "job-related and consistent with business necessity."[4] 42 U.S.C. § 12112(d)(4)(A). If so, then the County did not violate 42 U.S.C. § 12112(d)(4)(A) when it required Mr. Dengel to attend EAP meetings or obtain a work release.

"Employers must be able to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims." *Cody v. CIGNA Healthcare of St. Louis, Inc.*, 139 F.3d 595, 599 (8th Cir. 1998). The Seventh Circuit has noted that, under EEOC guidelines, medical examinations are "job-related and consistent with business necessity when an employer has a reasonable belief based on objective evidence that a

---

[4]There may be some valid question as to whether either the referral or return to work clearance requirement may be classified as a medical test. But, because both are job-related and consistent with business necessity, the Court need not and will not address that question.

medical condition will impair an employee's ability to perform essential job functions or that the employee will pose a threat due to a medical condition." *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 565 (7th Cir. 2009). Inquiries into an employee's psychiatric health are often permissible "when they reflect concern for the safety of employees and the 'public at large,'" especially in jobs affecting public safety. *Id.* (citing *Krocka v. City of Chicago*, 203 F.3d 507, 515 (7th Cir. 2000); *Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 99 (2d Cir. 2003)). For instance, in *Coffman*, the Seventh Circuit pointed out that "[a]lthough a psychological evaluation in response to 'withdrawn' and 'defensive' behavior might not be job-related in many vocations, we do not second-guess the propriety of such an evaluation for a firefighter." 578 F.3d at 566. That is because every fire department has "an obligation to the public to ensure that its workforce is both mentally and physically capable of performing what is doubtless mentally and physically demanding work." Such "special work environments" are particularly relevant to a court's determination of whether an examination is job-related and consistent with business necessity. *Id.* ("This special work environment convinces us that the Department's decision to refer Coffman for the fitness for duty evaluations was job-related and consistent with business necessity.") (citing *Krocka*, 203 F.3d at 515; *Conroy*, 333 F.3d at 99; *Watson v. City of Miami Beach*, 177 F.3d 932, 935 (11th Cir.1999) ("In any case where a police department reasonably perceives an officer to be even mildly paranoid, hostile, or oppositional, a fitness for duty examination is job related and consistent with business necessity.")).

Moreover, where there is evidence of instability or potential danger, employers are generally justified in seeking mental evaluations.

*Owusu-Ansah v. Coca-Cola Co.*, 715 F.3d 1306, 1311-12 (11th Cir. 2013) *cert. denied*, 134 S. Ct. 655 (U.S. 2013) ("in our view an employer can lawfully require a psychiatric/psychological fitness-for-duty evaluation under § 12112(d)(4)(A) if it has information suggesting that an employee is unstable and may pose a danger to others.") (citing *Conroy*, 333 F.3d at 97 ("[B]usiness necessities may include ensuring that the workplace is safe and secure."); *E.E.O.C. v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1283 (7th Cir.1995) ("It would seem that a requirement that employees not pose a significant safety threat in the workplace would obviously be consistent with business necessity: a safe workplace is a paradigmatic necessity of operating a business."); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1119 (11th Cir.1993) (holding that protecting employees from workplace hazards is a "business necessity" under Title VII)).

Given this legal backdrop, the Court does not believe there can be any dispute: the County's medical examination requirements were clearly job-related and consistent with business necessity. To begin, Mr. Dengel worked in a very sensitive position. He was part of a team responsible for ensuring that the County's radios worked properly. Those radios are used in all sorts of emergency-related services, such as law enforcement and fire response. Thus, the integrity of the system is of the utmost importance.

Meanwhile, Mr. Dengel's behavior would give any employer pause. It was occasionally detached from reality, as evidenced by Mr. Dengel's intense interactions with his supervisor about a paper towel key he believed was his. Likewise, it was explosive—in a number of incidents, Mr. Dengel became angry with his supervisors or co-workers. His behavior was also obsessive. When Mr. Dengel brought up a concern—be it the paper towel

key, the radio inhibition, or the steering problems on the van—he could not let it go. He often sidestepped supervisors in pursuit of getting the answers he wanted.

In combination, Mr. Dengel's behavior and his sensitive position, show that the County's requirement that Mr. Dengel visit EAP and obtain a return to work authorization were clearly job-related and consistent with a business necessity. Mr. Dengel's behavior was unpredictable and concerning. Seeing as he was working with very important equipment, which is absolutely vital to public safety, there was a business necessity for the County to verify Mr. Dengel's mental health. Moreover, the County's requirements of Mr. Dengel were very narrow. The County's employees did not seek meeting notes, nor did they require that Mr. Dengel do anything other than visit with EAP and obtain a return to work authorization. Their concern was clearly with ensuring a safe workplace and safe radio system for the County. For these reasons, the Court is obliged to find that the County's requirements that Mr. Dengel participate in EAP sessions and receive a return to work authorization were job-related and consistent with business necessity.

Finally, the Court finds it particularly important to highlight the fact that the radio inhibition issue, alone, would be sufficient reason for the County to have required Mr. Dengel to receive the medical evaluations. In that instance, Mr. Dengel became obsessed with what he believed were problems in the radio units. Despite several meetings with supervisors, in which he was told that the problems did not exist, Mr. Dengel could not let the issue go. Instead, he called numerous other higher-ups, leading to additional fruitless examinations. Given the nexus between his strange

actions and his job as a radio technician, the County would have been justified for this reason alone to demand that Mr. Dengel receive a medical evaluation.

Of course, when paired with the many other strange incidents, the County was fully justified in its actions. Accordingly, the Court is obliged to grant the County's motion for summary judgment on Mr. Dengel's medical evaluation claim.

### 2.2.2    Standard Discrimination Claim

"The ADA prohibits employers from discriminating against disabled employees because of their disability." *Dickerson v. Bd. of Trustees of Community College Dist. No. 522*, 657 F.3d 595, 600 (7th Cir. 2011) (citing 42 U.S.C. § 12112(a)). Thus, where a plaintiff can show that he or she is disabled, and that his or her employer took some discriminatory action because of the plaintiff's disability, he or she is entitled to redress under the ADA.

Plaintiffs can prove this in one of two methods: either the direct or indirect method. *Dickerson*, 657 F.3d at 601 (citing *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000)). Using the direct method, the plaintiff may submit either direct or indirect evidence of discrimination. *Dickerson*, 657 F.3d at 601 (citing *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004); *Bekker v. Humana Health Plan, Inc.*, 229 F.3d 662, 670 (7th Cir. 2000)). Direct evidence is rare: it "requires an admission by the [employer's] decision maker that his or her actions were based upon the prohibited animus," which employers are generally careful to avoid making. *Dickerson*, 657 F.3d at 601 (citing *Buie*, 366 F.3d at 503; *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 732–33 (7th Cir. 2011)). Use of circumstantial evidence is more common, and includes evidence such as: "(1) suspicious timing; (2) ambiguous statements

or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Dickerson*, 657 F.3d at 601 (citing *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 586–87 (7th Cir. 2011); *Burnell v. Gates Rubber Co.*, 647 F.3d 704, 708 (7th Cir. 2011)).

Mr. Dengel discusses the direct method of proof in his opening discussion of the contours of an ADA, but then he does not follow through with trying to prove up his discrimination case through use of the direct method. (*See* Pl.'s Resp. 9–15). Certainly, he does not present any direct evidence. (*See* Pl.'s Resp. 9–15). But he also does not discuss any of the types of circumstantial evidence; he may land upon a piece here and there, but he never does so in service of a direct-method discussion. (*See* Pl.'s Resp. 9–15).

Instead, though he does not explicitly say so in his brief, it seems that Mr. Dengel is trying to proceed under the indirect method. (*See* Pl.'s Resp. 9–15).[5] "Under the indirect method of proof, a plaintiff must first establish a *prima facie* case of discrimination." *Dickerson*, 657 F.3d at 601 (citing *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 601 (7th Cir. 2009); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Unfortunately, it is not exactly clear how the Seventh Circuit expects plaintiffs to do so. In *Dickerson*, for example, the Seventh Circuit noted that a plaintiff establishes a *prima facie* case by "showing that (1) he is disabled under the ADA; (2) he was meeting his employer's legitimate employment expectations; (3) he suffered an adverse

---

[5]And, given the lack of discussion of direct or circumstantial evidence presented, the Court has no choice but to proceed under that assumption.

employment action; and (4) similarly situated employees without a disability were treated more favorably." *Dickerson*, 657 F.3d at 601 (citing *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 601 (7th Cir. 2009); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). *See also, e.g.*, *Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 644 (7th Cir. 2013) (noting the four prima facie factors); *Teruggi v. CIT Group/Capital Finance, Inc.*, 709 F.3d 654, 659–60 (7th Cir. 2013) (same). However, in *Hoppe v. Lewis University*, cited by plaintiffs to establish the *prima facie* case elements, the Seventh Circuit stated that "[t]o establish disability discrimination, a plaintiff must prove that (1) she is disabled within the meaning of the ADA, (2) she is qualified to perform the essential functions of the job, either with or without a reasonable accommodation, and (3) she suffered from an adverse employment action because of her disability." 692 F.3d 833, 838–39 (7th Cir. 2012) (citing *Nese v. Julian Nordic Const. Co.*, 405 F.3d 638, 641 (7th Cir. 2005)). Thus, under *Hoppe*, it seems that there is no need to produce information about the treatment of similarly situated employees to establish a *prima facie* case.

Mr. Dengel must be desperately hoping that the Court applies the less-stringent test applied in *Hoppe*, because he has not provided the Court with *any* evidence regarding the treatment of similarly situated employees. On that basis alone, if the Court were to proceed under the *prima facie* test described in *Dickerson*, *Hobgood*, *Teruggi*, and many other tests, the Court could outright dismiss Mr. Dengel's discrimination claim. He simply has not even *attempted* to make a showing on one of the elements described in the test described in those cases. To be candid, the Court believes that the more stringent test described in *Dickerson*, *Hobgood*, and *Teruggi*, is likely the test that it should apply. *Hoppe*'s discussion vaguely alludes to the *prima facie* test,

but never adopts the seemingly less-stringent test as the *prima facie* test to be applied going forward. *See* 692 F.3d at 838–39.[6]

But here is the issue with taking that approach: though *Hoppe* may not explicitly say so, it retains some requirement of proof that the adverse employment action had to have been "because of" the plaintiff's disability. *Id.* That is the function of the *prima facie* test's similarly-situated-employees element—it goes to proving that an employer's animus caused the adverse employment action. So, while *Hoppe* may not explicitly state that there is a requirement to produce evidence regarding the treatment of similarly situated employees, it at least retains the vestige of some causation requirement. Thus, the Court finds that it must utilize the test described in *Dickerson*, *Hobgood*, and *Teruggi*, as the *prima facie* test under the indirect method.

Applying the *prima facie* test, the Court must determine that Mr. Dengel's claim cannot proceed under it. He has not produced any evidence regarding similarly-situated employees. Therefore, he cannot satisfy one of the elements of the *prima facie* test, and his claim outright fails.

So, here, the Court must circle back to the direct method: is Mr. Dengel attempting to proceed under the direct method. As discussed above, it does not appear so. He has not provided any evidence of a discriminatory animus on the County's behalf. He has not produced any emails or

---

[6] Additionally, if plaintiffs could satisfy their prima facie burden under Hoppe's less-stringent test, which is the exact same as the elements of an ADA claim as may be proved under the direct method, why would any plaintiff ever proceed under the direct method? In this scenario, the *prima facie* case would not have any additional requirements, and could hypothetically be satisfied without the use of direct or circumstantial evidence. That is an extremely employee-friendly test that the Court doubts should apply.

correspondence that lend any credence to the contention that the County's employees were hostile to him as a result of a perceived disability. In fact, most of the emails disclosed evince a genuine concern for his well-being. He has not produced any evidence of other disabled employees being treated poorly. Simply put, there is absolutely nothing that could possibly establish discriminatory animus. So, again, if Mr. Dengel is trying to proceed under the direct method, his claim would necessarily fail because he has not produced any evidence to show that the County took any adverse action against him *because of* his disability.

This is reinforced by the fact that the County had two legitimate, non-discriminatory reasons to take any allegedly adverse action against Mr. Dengel. First, as discussed above, given the sensitive nature of Mr. Dengel's position and his concerning activities, the County was absolutely justified in referring him to EAP for sessions and requiring a clearance before he could return to work. Mr. Dengel, at the very least, posed a safety risk to the public if he could not perform his duties as a radio technician. Likewise, because Mr. Dengel never allowed disclosure of that clearance, the County had every reason to believe that he was, indeed, not able to return to work. Finally, it was Mr. Dengel who refused to cooperate with the County's expectations—even against the advice of his own attorney, who advised Mr. Dengel to sign the waivers and undergo the required examinations—and who ultimately caused his own termination. The County has legitimate, non-discriminatory reason to let insubordinate and difficult workers go. Mr. Dengel continued refusing to cooperate in spite of the County's willingness to make several concessions (allowing him to make alterations to the waiver forms, allowing him to see his own counselor, not requiring him to take a

fitness for duty examination, etc.). The County had ample reason—totally apart from Mr. Dengel's alleged disability[7]—to take any of the allegedly adverse employment actions against Mr. Dengel that it did.[8] In sum, the Court simply cannot find that any of the County's actions were made "because of" Mr. Dengel's disability—particularly not when Mr. Dengel has not submitted any evidence in support of that position.[9]

All in all, there is little to say other than that Mr. Dengel's claim is utterly without merit. That fact is only exacerbated by the lack of adequate briefing from him. He provided practically no relevant evidence to support his claim, and then completely ignored the elements in his brief. The Court must grant summary judgment in the County's favor in this regard, dismissing Mr. Dengel's standard discrimination claim.

---

[7]Mr. Dengel does not assert that he is actually disabled, but rather that the County perceived him as disabled. Pursuant to 42 U.S.C. § 12102(3), Mr. Dengel may proceed as disabled if that is true. The Court has assumed so, given that Congress seemingly broadened the definition of "regarded as" when it amended the statute in 2010. *See, e.g.*, 154 Cong. Rec. S8342-01, 2008 WL 4180153. The Seventh Circuit has not yet decided a case based on the amended language however.

[8]This discussion has even assumed that the County can be said to have terminated Mr. Dengel's employment. In fact, Mr. Dengel, by failing to submit the required disclosures, can likely be said to have abandoned his employment.

[9]Finally, the Court also notes that, because the County had legitimate nondiscriminatory reasons for taking the actions it did, even if Mr. Dengel had established a *prima facie* case, he could not proceed without showing that the County's reasons were pretextual. He did not even address that point and, therefore, he would still fail under the indirect method even assuming he could establish the *prima facie* case.

### 2.2.3  Retaliation Claim

Mr. Dengel's briefing on the retaliation claim is also woefully inadequate. This is the entirety of his statement on the matter from his response brief:

> Employers are forbidden from retaliating against employees who raise ADA claims. *Dickerson v. Board of Trustees of Commty. Coll. Dist. No. 522*, 657 F.3d 595, 602 (7th Cir. 2011). Even if the employee is not disabled, it is still a violation of the ADA to retaliate against  an employee for attempting to raise good faith claims of disability discrimination. *Cassimy v. Board of Educ. of Rockford Pub. Schools, Dist. No. 205*, 461 F.3d 932, 938 (7th Cir. 2006). To establish a prima facie case of retaliation under the ADAAA, Mr. Dengel must show that (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. *McClendon v. Ind. Sugars, Inc.*, 108 F.3d 789, 796 (7th Cir. 1997).
>
> Mr. Dengel engaged in protected activity when his attorney, on his behalf, informed Defendant that he would not attend the Fitness for Duty Evaluation, that Defendant's inquiries into Mr. Dengel's mental health status was illegal under the ADAAA, and that Mr. Dengel was considering legal action against Defendant for the violations of his rights. (PPFOF ¶¶ 49, 56, 61, 67). Mr. Dengel suffered an adverse action when he was not allowed to return to work and was terminated. The casual connection is demonstrated the fact that Defendant's only reason for Mr. Dengel separation of employment was that he did not provide medical releases to Defendant, as well as by the temporal proximity between Mr. Dengel's complaints and his termination.

(Pl.'s Resp. 15–16) (sic throughout). To be clear, that is a total of two paragraphs, one of which recounts the legal standards, and the other of which is comprised entirely of legal conclusions. For all intents and purposes,

it is as if Mr. Dengel waived this claim. He certainly does not attempt to support it adequately.

Again, he has not indicated whether he intends to proceed under the direct or indirect method, but under either method his claim would fail. First, he did not engage in protected activity—the Court already determined that the County's medical examination requirement was job-related and consistent with business necessity, so Mr. Dengel's refusal to participate was not protected. Moreover, again, he has not provided any evidence to support his conclusion that any alleged protected activity caused the adverse employment action. The County made it clear, time and again, that failure to participate in EAP counseling and receive a return to work authorization would result in termination at the exhaustion of Mr. Dengel's leave. Mr. Dengel exhausted his leave without providing the necessary documentation, thus entirely justifying his termination. Moreover, seeing as the County had legitimate non-discriminatory reasons to take every one of its actions, as more fully discussed above, the County could rebut a *prima facie* case if Mr. Dengel could show it (which he cannot and he has not).

For all of these reasons, the Court is obliged to grant the County's motion for summary judgment on Mr. Dengel's retaliation claim.

3.    CONCLUSION

For the reasons discussed above, the Court is obliged to grant the County's motion for summary judgment in its entirety and to dismiss this action with prejudice.

The last matter to address is the documents filed under seal. Both parties have filed certain documents under seal, all of which relate to sensitive medical records. (Docket #42, Ex. 4; Docket #43; Docket #47, Ex. 2).

The County moved to seal its submission, and the Court will grant that motion, finding good cause to seal the document because it involves sensitive medical material. (Docket #48). Mr. Dengel did not file a motion to seal the documents he filed under seal, but the Court will maintain his documents under seal for the same reason. No portion of this order will be redacted or filed under seal because it does not discuss any specifics of Mr. Dengel's treatment.

Accordingly,

IT IS ORDERED that, for the reasons set forth above, the County's motion for summary judgment (Docket #24) be and the same is hereby GRANTED and this matter be and the same is hereby DISMISSED with prejudice; and

IT IS FURTHER ORDERED that the County's motion to seal (Docket #48) be and the same is hereby GRANTED.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 17th day of April, 2014.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge